RECEIVED 9/17/2020

FILED 9/17/2020
14th CIRCUIT COURT
MUSKEGON COUNTY

Approved, SCAO

Original - Court
1st copy - Defendant

 CCR-SAC

| STATE OF MICHIGAN | | |
|---|---|---|
| 14th | JUDICIAL DISTRICT | SUMMONS |
| | JUDICIAL CIRCUIT | |
| | COUNTY PROBATE | |

2020-003645-CZ

**Court address**
Muskegon County Circuit Court, 990 Terrace Street, Muskegon, MI 49442

**Court telephone no.**
(231) 724-6251

**Plaintiff's name(s), address(es), and telephone no(s).**
Stacey Hilton and Good Moos LLC
1698 Sanford Street
Muskegon, MI 49441

v

**Defendant's name(s), address(es), and telephone no(s).**
Ann Meisch
933 Terrace Street
Muskegon, MI 49440

(231)724-6705

Case Assigned to:
Annette Rose Smedley

**Plaintiff's attorney, bar no., address, and telephone no.**
Bradford W. Springer (P67201)
Scholten Fant
100 N. Third Street, P.O. Box 454
Grand Haven, MI 49417
(616) 842-3030   (bspringer@scholtenfant.com)

Instructions: Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**
☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.
☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.
☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**
☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.
☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).
☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____ .

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk.

**SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court (28 days if you were served by mail or you were served outside this state).**
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date | Expiration date* | Court clerk | |
|---|---|---|---|
| 09/17/2020 | 12/17/2020 | Nancy A. Waters | 09/17/2020 03:28 PM |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

NANCY A. WATERS - MUSKEGON COUNTY CLERK
PROXY SIGNED BY LARSENLI

MC 01   (9/19)   **SUMMONS**     MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

Seal - 9/17/2020
LARSENLI 9/17/2020
3:26:50 PM

**PROOF OF SERVICE**

| SUMMONS |
|---|
| Case No. 2020-003645-CZ |

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

**CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE**

| ☐ **OFFICER CERTIFICATE** OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that: (notarization not required) | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), and that: (notarization required) |

☐ I served personally a copy of the summons and complaint,
☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____
List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | | Signature |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled | Fee $ | TOTAL FEE $ | Name (type or print) |
| | | | | Title |

Subscribed and sworn to before me on _____, _____ County, Michigan.
Date

My commission expires: _____   Signature: _____
Date                                        Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

**ACKNOWLEDGMENT OF SERVICE**

I acknowledge that I have received service of the summons and complaint, together with _____
Attachments

_____ on _____
Day, date, time

_____ on behalf of _____
Signature

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF MUSKEGON

Stacey Hilton, and
Good Moos LLC,

      Plaintiffs,

      v.

Ann Meisch,

      Defendant.

Case No. 2020-003645-CZ

Case Assigned to:
Hon. Annette Rose Smedley

**Complaint and Jury Demand**

---

Bradford W. Springer (P67201)
SCHOLTEN FANT
Attorneys for Plaintiffs
100 North Third Street; P.O. Box 454
Grand Haven, Michigan 49417-0454
Telephone: 616/842-3030

---

### Complaint and Jury Demand

There is no other pending or resolved civil action arising out of the
transaction or occurrence alleged in this complaint.

Plaintiffs, Stacey Hilton and Good Moos LLC, for their complaint against the defendant,
Ann Meisch, respectfully state as follows:

### Introduction

1.    This is a cause of action brought under 42 U.S.C. Section 1983 to remedy
defendant's violation of plaintiffs' civil rights under the First and Fourteenth Amendments when
defendant retaliated against plaintiffs for exercising their First Amendment rights to free speech,
to associate and assemble, and to petition the government for a redress of grievances.

1

**Parties**

2.      Plaintiff Stacey Hilton is an individual residing in the City of Muskegon.

3.      Plaintiff Good Moos LLC is a Michigan limited liability company.  Ms. Hilton is the registered agent.

4.      Defendant Ann Meisch was at all times relevant to this complaint the City Clerk for the City of Muskegon and acting under color of state law.  She is sued in her individual capacity.  On information and belief, Ms. Meisch resides in Muskegon County.

**Jurisdiction**

5.      This Court has jurisdiction.  *See, e.g.*, MCL 600.605.

6.      This Court's jurisdiction is concurrent to the jurisdiction that a federal district court could exercise over this Section 1983 claim.  *Maine v. Thiboutot*, 448 U.S. 1, 3 n.1 (1980); *Martinez v. State of California*, 444 U.S. 277, 283 n.7 (1980).

**Venue**

7.      Venue is proper in this Court.  *E.g.* MCL 600.1621; MCL 600.1627.

**Count I:**
**Defendant's Liability under 42 U.S.C. Section 1983--**
**Violation of First and Fourteenth Amendments for First Amendment Retaliation**

8.      Plaintiffs incorporate by reference paragraphs 1-7, above.

9.      Ms. Hilton is a nurse, but in order to generate supplemental income and to pursue a longtime goal of owning her own business, she formed an ice cream business in 2019 called Good Moos LLC.

10.      Ms. Hilton leased a chalet for her new business in the City of Muskegon's Western Market program for the 2019 season.

2

11.     The Western Market program is designed to attract and foster small businesses and create retail shopping in downtown Muskegon.

12.     The City seeks to accomplish this goal by offering 17 small rental units (called "chalets") along Western Avenue in downtown Muskegon for lease to small businesses at a reduced rate.

13.     The Western Market program is administered by the City Clerk's Office.

14.     Ms. Meisch, the City Clerk, manages the City Clerk's Office and the Western Market program.

15.     Ms. Hilton signed the lease agreement for plaintiffs.  Ms. Meisch signed the lease agreement for the City.  A copy of the lease is attached as **Exhibit A**.

16.     As a family-friendly establishment, and to make her business more inviting, Ms. Hilton made sidewalk chalk available to her customers and their children to color the sidewalk near plaintiffs' chalet while enjoying ice cream.

17.     In addition, Ms. Hilton's associate, Diane Neas, routinely chalked friendly, positive, and inspirational messages on the sidewalk near plaintiffs' chalet.

18.     Ms. Meisch was aware of the chalking, as she routinely visited the Good Moos chalet and complimented Ms. Hilton and Ms. Neas on the positive atmosphere they were creating.

19.     Indeed, pictures of several of these chalk messages were featured on the City's website promoting Western Market.

20.     On information and belief, Ms. Meisch posted these pictures on the City's website promoting Western Market or authorized and approved the posting of these pictures.

21.     On August 6, 2019, in response to the mass shootings in El Paso, Texas and Dayton, Ohio, and in reaction to additional incidents of gun violence occurring nationwide in the summer of 2019, this aroused sorrow and frustration in Ms. Hilton and Ms. Neas over the continued senseless loss of lives.  Ms. Neas felt compelled to chalk a message on the sidewalk near plaintiffs' chalet, imploring political leaders to take action to end gun violence.

22.     When Ms. Meisch learned of the message, she immediately called Ms. Hilton and told her to remove it.

23.     Not wanting to offend the City Clerk in charge of the Western Market program, Ms. Hilton immediately complied and removed the message.

24.     However, as Ms. Hilton reflected on this, she felt silenced on an issue important to her, and she wanted her voice to be heard.

25.     So, after removing the message at the chalet, Ms. Hilton went with Ms. Neas that same afternoon to Muskegon City Hall.

26.     There, on the public sidewalk in front of City Hall at 933 Terrace Street, Ms. Neas peacefully chalked the same message, urging public officials to act to end gun violence.

27.     While Ms. Neas was doing this, Ms. Meisch came out of City Hall and took Ms. Neas's and Ms. Hilton's picture.

28.     Ms. Meisch asked them if they really wanted to do this.

29.     Ms. Meisch asked them this question in a disapproving manner.

30.     Ms. Meisch asked them this question in a threatening manner (not physically threatening, but threatening all the same).

31.     Ms. Meisch told them that this could affect their application to renew their lease for their chalet for the 2020 season.

4

32.    Plaintiffs' application to renew their lease of their chalet for the 2020 season was indeed denied.

33.    Ms. Meisch informed Ms. Hilton in March of 2020 that a "selection committee" decided not to grant plaintiffs' application to renew the lease for their chalet.

34.    In place of Ms. Hilton and her business, the application of another ice cream business was granted instead.

35.    The City's practice in administering the Western Market program had been to give first priority to successful businesses already in the program wishing to return.

36.    The denial of plaintiffs' renewal application was very disappointing to Ms. Hilton and essentially put her out of business.  She had borrowed significant sums to start her business, and she had invested in the necessary but expensive equipment and products.  Her business was new and just getting off the ground, and she was looking forward to the continued growth she was expecting that would have allowed her to recoup her expenses, turn a profit, and eventually expand to a brick-and-mortar location in the City.

37.    All of these goals were realistic and achievable based on her revenues and success in the Western Market chalet in plaintiffs' first season.

38.    All of these goals were in line with the very purpose of the Western Market program in the first place, i.e., supporting economic development and small business incubation in the City's downtown by providing low-cost space to fledgling small businesses with promising futures.

39.    Instead, as a result of the denial of her renewal application, Ms. Hilton was left without affordable space and with a balance on a loan from her bank, requiring her to sell much of her most expensive equipment, leaving her unable to continue her business at this time.

40.     The real and motivating reason Ms. Hilton's application was denied is because Ms. Meisch followed through on her threat that plaintiffs' lease would not be renewed in retaliation for plaintiffs having exercised their core First Amendment rights.

41.     In a March 2, 2020 email from Ms. Meisch to the City of Muskegon Commissioners and apparently copied to the chalet selection committee, Ms. Meisch claimed that the primary reason the committee decided to reject plaintiffs' renewal application is because, according to Ms. Meisch, plaintiffs' ice cream busines was not open as often as it should have been in the fall/winter months because of cold weather.

42.     Ms. Meisch concedes in the same message that she did not keep track of any alleged missed days.

43.     A copy of defendant's March 2, 2020 email is attached as **Exhibit B**.

44.     Defendant's suggestion that plaintiffs missed numerous days is false.

45.     In fact, plaintiffs missed only two days that they are aware of.

46.     This is less than the five days plaintiffs were allowed to miss as "grace days" under the lease agreement with the City.

47.     In her March 2, 2020 email, Ms. Meisch specifically mentions the following:

a.      Ms. Hilton's and Ms. Neas's political chalking on the sidewalk in front of City Hall;

b.      what Ms. Meisch describes as Ms. Neas's "disturbing" private Facebook comments regarding her political disagreements with a local priest concerning the issues of abortion and immigration; and

6

c.  Ms. Hilton's and Ms. Neas's previous request (during the time they were renting their chalet) to hold a voter registration drive at their chalet, which Ms. Meisch admitted she did not allow.

    i.  Ms. Meisch concedes that at the beginning of plaintiffs' lease period, Ms. Meisch had said that a voter registration drive would be a possibility at that location.

    ii.  Ms. Meisch changed her mind to "no" after the chalking incident in front of City Hall.

    iii.  Defendant refused to allow plaintiffs' request to conduct a voter registration drive.

    iv.  This is despite the fact that, according to the City's own website, the City Clerk's Office itself conducts neighborhood voter registration drives. [https://www.muskegon-mi.gov/departments/city-clerk/, accessed September 2, 2020.]

    v.  No ordinance or other law prohibited plaintiffs from conducting a voter registration drive.

    vi.  Defendant had no lawful basis to deny plaintiffs' request to conduct a voter registration drive.

48.  Ms. Meisch's March 2, 2020 email mentions all three of these First Amendment issues listed in subsections (a) through (c) in the preceding paragraph, even though she claims in the same email that the reason the committee rejected plaintiffs' renewal application is because plaintiffs were not open enough in the cold weather months.

49.    Ms. Meisch's March 2, 2020 email is her attempt to cover up and "paper over" the real reason plaintiffs' renewal application was rejected.

50.    Defendant's email is an admission proving retaliation.

51.    If not being open enough were the real reason for the rejection of plaintiffs' renewal application, none of the three incidents described above that Ms. Meisch discussed in her March 2, 2020 email to the City Commission would be relevant or appropriate to mention for any proper purpose.

52.    Although Ms. Meisch's discussion of all three of these First Amendment issues listed above is concerning, the fact that she would present the City Commission with Ms. Neas's private Facebook posting regarding the expression of her deeply personal and strongly-held political views about the mistreatment of immigrant children—which has nothing to do with Ms. Neas's interaction with Ms. Meisch or plaintiffs' chalet renewal application—is particularly disturbing.

53.    In Ms. Meisch's March 2, 2020 email, Ms. Meisch states that she is not a voting member of the committee "but I was present to present the applications."

54.    This is a failed attempt by Ms. Meisch to distance herself from the committee or to argue that it acted separately from her or that she did not influence its decision.

55.    In fact, the committee is simply a staff committee.

56.    In fact, the committee is not a public body.

57.    In fact, Ms. Meisch makes recommendations to the committee to act on the applications.

58.    In fact, the committee follows Ms. Meisch's recommendations.

59.    On information and belief, Ms. Meisch recommended that the committee deny plaintiffs' renewal application.

60.    In other words, even though it may be true that the committee, not Ms. Meisch, "voted" to reject plaintiffs' renewal application, the committee simply acted as the conduit for Ms. Meisch's bias against plaintiffs.

61.    This is an example of what the Sixth Circuit Court of Appeals calls "the cat's paw" theory in the context of a First Amendment retaliation claim brought under Section 1983. *Paterek v. Village of Armada, Michigan*, 801 F.3d 630, 651 (6th Cir. 2015) ("The 'cat's paw' theory refers to a situation in which a biased official, who lacks decision-making power, influences the unbiased decision-maker to take an adverse enforcement action.") (Internal quotations and punctuation omitted).

62.    The denial of plaintiffs' renewal application was motivated at least in part by plaintiffs' conduct described in paragraph 47 (a) through (c) above.

63.    The above facts establish that Ms. Meisch was motivated at least in part by plaintiffs' constitutionally protected conduct, thus confirming a straightforward claim, pursuant to 42 U.S.C. Section 1983, for retaliation for exercising the core First Amendment rights of free speech, assembly, and petitioning the government to redress grievances. *Paterek*, 801 F.3d at 645 ("To succeed on a First Amendment retaliation claim, the following elements must be proven: '(1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct.'") (Quoting *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 723 (6th Cir. 2010)).

64.     The Sixth Circuit has repeatedly recognized the right to be free of retaliation for exercising First Amendment rights in numerous cases that are not meaningfully distinguishable. *See, e.g., Paterek, supra; Fritz, supra; Lucas v. Monroe County*, 203 F.3d 964, 972 (6th Cir. 2000) ("The Supreme Court has consistently held that the government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.") (Omitting internal quotations of the Supreme Court's opinion in *Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996)); *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) ("The issue in a First Amendment retaliation claim is the grounds actually relied upon, not those that might have been relied upon by some other government agent in a similar situation, and plaintiffs need only show that the action was taken at least in part because of the exercise of the protected conduct.") (Internal quotation omitted); and *Paige v. Coyner*, 614 F.3d 273, 283 (6th Cir. 2010) ("an act taken in retaliation for the exercise of a constitutionally protected right is actionable under §1983 even if the act, when taken for a different reason, would have been proper.") (Internal quotations omitted).

65.     Plaintiffs were engaged in constitutionally protected conduct when they associated with their business associate, Ms. Neas, while she chalked political messages on the public sidewalk along the street in front of City Hall.

66.     Plaintiffs were engaged in constitutionally protected conduct when they associated with their business associate who had submitted a private Facebook posting regarding the expression of her deeply personal and strongly-held political views about the mistreatment of immigrant children.

67.     Plaintiffs were engaged in constitutionally protected conduct when they sought to conduct a voter registration drive at their place of business.

10

68.     By denying (or by causing a selection committee to deny) plaintiffs' application to renew the lease of their rental chalet for engaging in constitutionally protected conduct, Ms. Meisch took an adverse action against plaintiffs that would deter a person of ordinary firmness from continuing to engage in that conduct.

69.     Ms. Meisch's adverse action of denying (or causing a selection committee to deny) plaintiffs' application to renew the lease of their rental chalet was motivated at least in part by plaintiffs' protected conduct.

70.     Ms. Meisch's adverse action was intentional, for the very purpose of retaliating against plaintiffs for engaging in constitutional conduct.  At a minimum, Ms. Meisch's adverse action against plaintiffs was taken with reckless or callous indifference to plaintiffs' federally protected rights.  Thus, plaintiffs are entitled to an award of punitive damages.  *Smith v. Wade*, 461 U.S. 30, 56 (1983) ("We hold that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.")

71.     By retaliating against plaintiffs for exercising their First Amendment rights as described above, defendant Meisch, acting under color of law as City Clerk of the City of Muskegon, subjected plaintiffs (or caused plaintiffs to be subjected) to the deprivation of rights secured by the First Amendment to the Constitution, made applicable to the states by the Fourteenth Amendment, all in violation of 42 U.S.C. Section 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .")

72.     As a result of Ms. Meisch's retaliation, plaintiffs have suffered economic and constitutional damages in an amount greater than $25,000.

73.     The conduct of Ms. Meisch—using the power of her governmental position as City Clerk to retaliate against plaintiffs for exercising their First Amendment rights in their own community—is unlawful and unacceptable, particularly in a proud City like Muskegon.

### Relief Requested

WHEREFORE, plaintiffs respectfully demand judgment in their favor and against defendant.  Plaintiffs respectfully demand the following specific relief:

    a.    money damages in excess of $25,000 in an amount to be determined at trial;

    b.    punitive damages;

    c.    statutory attorneys' fees under 42 U.S.C. Section 1988;

    d.    other costs of suit; and

    e.    such other relief and costs as this Court deems equitable and just.

### Jury Demand

Plaintiffs respectfully demand trial by jury.

Dated:   September 15, 2020

        Respectfully submitted,

        Stacey Hilton, and Good Moos LLC

        By:   *Bradford Springer*
           Bradford W. Springer

# EXHIBIT
# A

## Western Market
## 2019 Lease Agreement

This AGREEMENT made and entered into the 26th day of _march_, 2019 by and between the City of Muskegon "City", 933 Terrace Street, Muskegon, MI 49440 and _Steven Hilton_ "Tenant" of a certain chalet located on Western Avenue between 1st Street and 2nd Street, Muskegon, MI 49440.

A. The City of Muskegon has agreed to grant a revocable, non-transferable, and non-exclusive use of _A._ chalet on Western Avenue between 1st Street and 2nd Street adjacent to the U.S. Post Office.

B. Tenant has agreed to rent the _A._ chalet from the City. Therefore, the parties agree as follows:

1) **Use.** Retail purposes only.

2) **Rent.** Rental amount $ 2,125 °° for the season.

3) **Length of Agreement.** The agreement will take effect on _May 25 2019_ through December 14, 2019. Penalty for vacating premises before term expires is $50 per day.

4) **Security Deposit** $150.

5) **Trash.** The Tenant is responsible for moving any trash from the public rights of way connected to Tenant's business. If Tenant does not remove trash, the City of Muskegon may remove the trash and bill the Tenant.

6) **Sublease.** The Tenant may not sublease its space in whole or part to any other individual or business. All Tenants must be listed on the original lease unless authorization is given from staff.

7) **Repair & Maintenance.** The City shall be responsible for all repairs unless damage is deliberate by tenant. In this case, the Tenant shall be responsible to pay for any repairs the City shall make.

8) **Damage.** Any damage or permanent changes to the structure shall be repaired and restored by the Tenant or the tenant will be charged any fees incurred by the City of Muskegon.

9) **City Inspections.** City allowed to conduct inspections upon reasonable notice.

10) **Insurance.** The Tenant shall provide a Commercial General Liability insurance of not less than $1,000,000 naming the City of Muskegon as the certificate holder. The following language must be listed on the insurance, "ADDITIONAL Insured: City of Muskegon, all elected and appointed officials, all employees and volunteers, all boards, commissions, and/or authorities and board members, including employees and volunteers thereof." The insurance policy must be in place and on file in the City Clerk's Office before tenant may commence business. The insurance policy must be active throughout the entire season or tenant will not be allowed to operate until policy is active.

11) **Operating Covenant.**

a. The Tenant shall not abandon or leave vacant the chalet and shall not allow anyone other than Tenant, its employees, or agents to occupy it. Tenant shall not conduct an auction, going-out-of-business, bankruptcy sales, or similar practice.

b. Tenant may not display merchandise outside of the chalet or obstruct the public rights of way without prior written consent from the City of Muskegon.

c. Tenant must keep their chalet and surrounding area clean, neat, and safe.

d. Tenant will refrain from using the chalet in any way that is disruptive, a nuisance, annoyance, or an inconvenience.

e. Tenant must keep the chalet continuously and uninterruptedly open for business and adequately staffed during the following hours:

   May 25 – September 1 open Wednesdays through Fridays from 11 am to 6 pm
   May 25 – September 1 open Saturdays from 9 am to 3 pm
   Open Sundays for the month of July from noon to 3 pm
   Open all cruise ship and festival days
   Open Saturdays, September 7 through October 26 from 9 am to 3 pm
   Open Saturdays, November 30 through December 7 from 9 am to 3 pm
   Open Saturday, December 14 from 9 am to 4 pm

   Noting that emergencies do arise from time-to-time, a grace period of five absences will be given (unless Tenant has contacted staff and received written authorization for more absences under extenuating circumstances). After five such absences, the Tenant will be fined $50 for each day they remain closed for the season.

f. Tenant will maintain a stock of merchandise throughout the season.

g. Tenant will comply with all laws, ordinances, orders, rules, regulations, and requirements of federal, state, county, and city government regulating the use and occupancy of the chalet.

h. Tenant will not install any signs on the chalet or display any additional signs on the sidewalk or porch. No outside displays shall be attached to the building, cover the building, or cover the windows. If outdoor displays are used, they must be tastefully decorated. They cannot be on the sidewalk. It is the tenant's responsibility to inform their employees of the rules. Items must be removed immediately when told and a $50 fine will be issued after the second warning of the season. If racks are used, they are limited to one rack for their outdoor display. Three or more violations of this section may result in not being allowed to participate as a vendor in future seasons. Special instructions for setup of art fair and Rebel Road will be issued at a later date.

i.  No changes should be made to the inside structure or the outside of the chalet in such a manner as to detract from the character and standards of the chalet.

j.  Tenant shall say no disparaging remarks to the public about the City, downtown, or any entity involved in the chalets or downtown. Vendors shall be courteous to other vendors, customers, and other business owners.

k.  Tenant shall provide a copy of their sales tax license and any other licenses required by City, State, or Federal government.

l.  Electricity is limited. Tenant may plug in a lamp, air conditioner/heater, cell phone, or music. Any other items such as a cooler, refrigerator, appliance, etc. will pay an additional $50 for the season per EACH appliance. List any appliances to be used at the chalet _____1 freezer, 1 small fridge_____ Initial here to state your understanding that it is your responsibility to report if you add an appliance and pay the $50 fee. _____

m.  Tenant shall participate in marketing chalet including social media, events, and participating in activities at Western Market.

n.  Tenant is responsible for their own internet connection to accept payments. The city is not responsible for any missed sales that may happen from the lack of internet.

o.  Tenants shall keep the outside and inside of their chalet clean at all times. Tenants shall pick-up any trash outside of their chalet and dispose in a proper manner.

12) Default. Tenant agrees should tenant breach any provisions in the agreement, the City of Muskegon may at any time declare the Tenant in default and terminate the agreement immediately.

13) Indemnification. Tenant shall indemnify City, its officials, etc. against any and all acts arising out of Tenants use of the chalet and all claims, liability, liens, etc.

14) Reimbursement. Tenant agrees that it shall reimburse City of Muskegon for any and all costs and expenses, including reasonable attorneys' fees that City of Muskegon incurs in connection with the enforcement of its rights under this Agreement.

15) Remedies. Failure to pay rent, failure to perform any covenant will give the City the right to terminate the Agreement.

16) Governing Law. This Agreement shall be governed by the laws of the State of Michigan.

17) Entire Agreement. This Agreement shall constitute the entire agreement and supersedes any other written or oral agreements between the parties.

*Spectrum Proposal*
*with*
*Twin City Fire Insurance Company*
*A member company of The Hartford*
*4/11/2019 - 4/11/2020*

18) **Severability.** Should any one or more of the provisions of this Agreement be determined to be unlawful, invalid, or unenforceable, the remaining provisions of this Agreement shall not be impaired.

IN WITNESS WHEREOF, the City of Muskegon and tenant have caused this agreement to be executed on the 21st day of November 2019

WITNESSES:                                    City of Muskegon

Kimberly Young                               By _____

_____

Kimberly Young                               Tenant:

_____                         By _____



# EXHIBIT B

**Ryan Cummins**

| | |
|---|---|
| **From:** | ann.meisch@shorelinecity.com |
| **Sent:** | Monday, March 2, 2020 2:47 PM |
| **To:** | CommissionAll@shorelinecity.com; frank.peterson@shorelinecity.com |
| **Cc:** | sarah.petersen@shorelinecity.com; Jacqui.Erny@shorelinecity.com; ryan.cummins@shorelinecity.com; jamie.pesch@shorelinecity.com; beth.lewis@shorelinecity.com; john@parmenterlaw.com |
| **Subject:** | Good Moos - Chalet |
| **Attachments:** | 20200302142649824.pdf |

I wanted to share that the committee to select chalets met last week.

I am not a voting member but I was present to present the applications.

After careful consideration, the committee decided not to invite Good Moos back.

Good Moos struggled to be open in the fall and winter because of the product they sell. We did indicate from the beginning that they must be open and have a plan for other things to share. I don't have a count of the number of days they missed. They are suppose to report it but most of the time we would find they did not open in the fall and we were not told. When I questioned why, they indicated they were not selling and did not want to be there if they were not selling.

In July the attached message was posted on Facebook. It was disturbing to see the Priest of St. Mary's church being discussed in such a way and posted on fb.

In August, they wrote a political message in chalk on the sidewalk in front of the chalets. I contacted them and let them know that political messages cannot happen at the place of business. They then came to City Hall and wrote the same political message on sidewalk of city hall around the building which we removed.

While everyone does have the right to their political beliefs, several of the chalet vendors have told me they agree it should not be at their place of business. The message was about gun violence. Many stated it did not mean they were for or against the saying, just that it did not belong at their business.

Many of the chalet vendors were approached by the vendors of Good Moos afterward asking their opinion. They asked to do a voter registration drive at the chalets. I did indicate they could not. It would be fair to state they asked me at the beginning of the season if they could have a registration drive and I did say it could be a possibility, but at the end of the season and based on what happened above, I thought it better not to allow it.

The most concerning reason the committee stressed was the lack of attendance last year in the colder season.

Good Moos was informed today that their application to return was not accepted. They have taken to social media to state their opinion and frustration and reaching out for legal assistance against the City. The chalets are not a guarantee. I did not state a reason as to why they were denied, I only indicated the committee reviewed all applications and unfortunately theirs was denied.

We did have an application from another ice cream vendor and we have an application from a pizza maker that we think will do great.

Muskegon FOIA Response Chronologically 000423

If anyone wants to call and ask me more details. I'm happy to speak. We had four committee members able to make it that day and all four did deny the application █████████

Ann

Muskegon FOIA Response Chronologically 000424

7:24

 Diane Neas

 **Diane Neas**
July 4 · 

"Hey pro-lifers ---> Immigrant children in cages have heartbeats, too."

This is the message on the back window of my van. Today, someone took offense to it. A priest took offense to it. So much so, that he felt the need to put a prayer card AND a personal note under my windshield wiper.

"I'll pray for you, Fr. Matt."

Fortunately, or unfortunately, I was just half a block from St. Mary's in Muskegon. Note in hand I walked up to the iron fence that surrounds the grounds. I held up said note and asked if Father Matt was there. A young priest raised his hand and said he was. I asked him why he felt the need to pray for me. He said "you know . . . because of your message."

"Why?" I asked, "do you need to pray for me when I care about the immigrant children, too?"

"Because you obviously have anger toward pro lifers."

"I have anger toward hypocritical pro lifers," I said, "it's pretty arrogant and condescending to say you'll pray for me. I don't need you to pray for me. Pray for the families at the border. Don't put messages on my car."

"Don't park in front of my rectory." he said. Don't. Park. In. Front. Of. My MY MY. Rectory.

"It's a public road, Matt, keep your religion behind the fence."

He then said, "I gave 20,000 to an immigrant program this year."

     

7:24

<    Q   Diane Neas

He then said, "I gave 20,000 to an immigrant program this year."

"Did ya? Did ya Matt? Good for you. You're one of the few."

"There are cameras all around here" he said.

"Good. I'll start recording you then too."

That is when he stopped talking. Instead, he smarmilly and with sarcasm, mimed he would continue to pray for me. He pointed at his chest, then me, then did prayer hands and shot me a snotty look.

"Fuck off Matt. Can't say anything now, can you? You're a good example as to why Christians suck. You get your hands into religion and fuck it all up."

As I was walking away a woman stopped to see if poor Matt was ok. I turned around and told Matt that when he wanted to come out from behind gilded walls we could talk.

THIS IS NOT WHAT A PRIEST IS. I hope Matt comes to get ice cream.

 8                  16 Comments

 Like                ⊙ Comment

 **Gina Russo-Rea**
We need to help and pray for unborn children as well as immigrant children that... See More

View 2 previous replies...

 **Diane Neas**
**Jason Thomas** I won't take prayer from those who believe in it but I d... See More

 Write a comment...           

      

Muskegon FOIA Response Chronologically 000426